Randi Kassan
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza
Garden City, NY  11530
Telephone: (212) 594-5300
rkassan@milberg.com

*Attorney for the Plaintiff*
*and on behalf of all others similarly situated*

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JERRY HILL, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        -vs.-<br><br>FLOSPORTS, INC.,<br><br>        Defendants. | CASE NO.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jerry Hill ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant FloSports, Inc. ("FloSports" or "Defendant").  Plaintiff make the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and their counsel, which are based on personal knowledge.

## I.      INTRODUCTION

1.      This is a putative class action lawsuit against Defendant based on its business practices that violate failure to provide the requisite disclosures and authorizations required to be made to and obtained from New York consumers pursuant to New York General Obligations Law § 5-903.

2.      In addition, on a nationwide basis, Defendant has violated the Electronic Funds Transfer Act ("EFTA") by uniformly and routinely initiating preauthorized electronic fund transfers taking money from the bank accounts of Plaintiff and members of the Nationwide EFTA Subclass without obtaining their written authorization for the transfers and routinely failing to provide a copy of any such written authorization to Plaintiff and the Nationwide EFTA Subclass members from whose bank accounts Defendant took preauthorized electronic fund transfers for membership fees.

3.      Founded in 2006, FloSports describes itself as "a venture-backed subscription video streaming service dedicated to sports, offering live and on-demand access to hundreds of thousands of competition events across 25+ vertical sport categories in the US and abroad.

4.      With a growing library of more than 300,000 hours of premium content including news, expert commentary, films, documentaries and more, FloSports has established itself as an innovator and leader in sports streaming."[1]

5.      Defendant is based in Austin, TX and provides subscription sports broadcasting and streaming services across its network sites through its website - https://www.flosports.tv/ (the "Defendant's Website").

---

[1]https://www.flosports.tv/about/#:~:text=Founded%20in%202006%2C%20FloSports%20is,in%20the%20US%20and%20abroad.

6. Through its Website, Defendant markets, advertises, and sells to consumers in New York and throughout the United States paid memberships for broadcasting and streaming services for numerous sports events[2] (collectively, the "Subscriptions").

7. To sign up for one of Defendant's Subscriptions through the FloSports Website, customers must provide Defendant with their billing information and Defendant then automatically charges customers on monthly or yearly basis.

8. Plaintiffs' allegations include that at the check-out screen they were misled into believing that they signed up for service in which they would be charged a monthly fee only to discover that they were in fact charged an annual fee which was exponentially higher than the monthly fee.

9. Defendant is also able to unilaterally charge its customers' renewal fees without their consent, as Defendant is in possession of its customers' billing information.

10. Defendant has concocted a scheme to charge Plaintiff and other similarly situated customers on a yearly basis, absent their consent under the ARL, absent the requisite disclosures under the ARL, and in reliance on consumer confusion – many of whom believe they are paying a monthly fee that can be cancelled at any time.

11. The Federal Trade Commission (FTC) Act's Section 5 is the primary federal statute that governs the use of ARL provisions. The FTC's guidance on negative option features advises businesses to adhere to five fundamental principles for compliance. (See Negative Options – A

---

[2] The sporting events and corresponding channels are as follows: FloBikes, FloBowling, FloCheer, FloComba, FloDance, FloElite, FloFC, FloFootball, FloGrappling, FloGymnastics, FloHockey, FloHoops, FloLive, FloMarching, FloRacing, FloRodeo, FloRugby, FloSoftball, FloSwimming, FloTrack, FloVoice, FloVolleyball, FloWrestling, and Varsity.

Report by the staff of the FTC's Division of Enforcement attached hereto as Exhibit "1"). The five principles are as follows:

> **Principle 1**. Disclose material terms, including existence, total cost, third-party billing terms, and how to cancel payment (See *Id*. at p.8);
> **Principle 2**. Make disclosures visible by placing them in prominent locations (See Exhibit *Id*. at p.7);
> **Principle 3**. Disclose material terms of the offer to consumers before payment (See *Id*.);
> **Principle 4**. Obtain consumers' affirmative consent to the offer **rather than relying on a pre-checked box** (emphasis added) (See Exhibit "1" p.7); and
> **Principle 5**. Avoid impeding the effective operation of promised cancellation procedures (See Exhibit "1"p.7).

## II.   PARTIES

12.     Plaintiff Jerry Hill is a citizen of New York, residing in Tonawanda, New York.

13.     On or around February 2022, Mr. Hill purchased what he thought was a monthly FS Subscription ("FloRacing") from Defendant's Website while in New York.

14.     During the enrollment process, but before finally consenting to Defendant's subscription offering, Mr. Hill provided his Payment Method information directly to Defendant.

15.     At the time that Mr. Hill enrolled in his FS Subscription program, he only wanted to watch one race and thought he would incur a monthly charge of approximately $12.50 per month.

16.     Instead, he was charged a fee of $160.00 to watch one race.

17.     Again, Mr. Hill had no idea that he was going to be charged $160.00 as Defendant's Checkout Page design prominently displayed on the center of the webpage that the purchase price was $12.50 per month.

18.     Mr. Hill was not offered the monthly subscription option of $29.00 per month at the time of his purchase.

19.     However, Defendant did not respond to his request to change his subscription.

4

20.    Mr. Hill just wanted to watch one race and would have paid the $29.00 monthly fee had he been offered this option at the time of purchase.

21.    He notified Defendant that he did not authorize the $160.00 charge and requested a refund for the unauthorized charge to his Payment Method.

22.    Mr. Hill also requested that Defendant charge him the monthly payment option of $29.00 per month since he just wanted to watch one race.

23.    However, Mr. Hill did not receive a response from the Defendant regarding his request.

24.    When the Defendant finally responded to him, he was told by the Defendant that since he did not contact Defendant within 30-days that the subscription could not be changed and refund could not be issued.

25.    However, Defendant failed to acknowledge that Mr. Hill had contacted FloSport within 30-days of purchase and made the request to change subscription to monthly and refund the annual charge.

26.    But, the Defendant ignored his requests.

27.    Defendant did not disclose to Mr. Hill all of the required automatic renewal offer terms associated with the subscription program or obtain Mr. Hills's affirmative consent to those terms.

28.    Further, after Mr. Hill completed his initial order, Defendant sent Mr. Hill an email confirmation and receipt for his purchase of and enrollment in the FS Subscription (the "Acknowledgment Email").

29.    However, that email also failed to provide Mr. Hill with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation

policy, or information regarding how to cancel Mr. Hill's FS Subscription in a manner capable of being retained by him.

30.     Mr. Hill did not receive any other acknowledgement that contained the required information.

31.     As a result, Mr. Hill was not placed on notice of several material terms associated with his FS Subscription.

32.     Mr. Hill was not made aware of the recurring price to be charged upon renewal, the length of the renewal term, when the first charge would occur, or the complete cancellation policy associated with his FS Subscription: the most crucial aspects of which were missing from the Checkout Page and Acknowledgment Email.

33.     Defendant's misleading, missing and incomplete disclosures on the Checkout Pages and in the Acknowledgment Emails, its failure to obtain Mr. Hills's affirmative consent before charging his Payment Method on a yearly basis, and its subsequent refusal to issue a refund of those unauthorized charges, are contrary to the ARL, which deems products provided in violation of the statute to be a gift to consumers.

34.     Had Defendant complied with the ARL, Mr. Hill would have been able to read and review the auto renewal terms prior to purchase, and he would not have subscribed to FS Subscription at all.

35.     FloSports is a Delaware corporation with its principal place of business at 979 Springdale Rd, Ste 120, Austin, Texas, 78702.

36.     Defendant offers access to certain exclusive FloSports content, products, and/or services on a contract or fee basis to customers who enroll in the automatically renewing FS Subscriptions.

37.    Defendant wholly owns and operates the FS Subscriptions, which it markets to consumers through the FloSports Website.

38.    Defendant is responsible for the promotion, advertisement, and/or marketing of the FS Subscriptions, and it owns and operates the FloSports Website.

39.    Defendant sells – and, at all times during the applicable Class Periods, sold – the FS Subscriptions in New York and has done business throughout the United States.

40.    In connection with the FS Subscriptions, Defendant made automatic renewal offers to consumers in New York and throughout the United States via the FS Website at all relevant times during the applicable Class Periods.

41.    Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## III.    JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from Defendant.

43.    This Court has personal jurisdiction over the parties because Plaintiff resides in New York and submits to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted business in New York within this District, and/or intentionally availed itself of the benefits and privileges of the New York consumer

market through the promotion, marketing, and sale of its products and/or services to residents within this District and throughout New York. Additionally, Plaintiff purchased his FS Subscription from Defendant while residing in this state.

44.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Also, Plaintiff resides in this District and purchased Defendant's FS Subscription in this District. Moreover, Defendant systematically conducts business in this District and throughout the State of New York and it distributed, advertised, and sold the FS Subscriptions to Plaintiff and Class Members in these States and Districts.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.  The History of the Subscription e-Commerce Market

45.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[3] Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests. Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years. Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[4] Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[5] That constitutes an average annual

---

[3] See https://www.coredna.com/blogs/ecommerce-subscription-services.

[4] Business Insider, Taco Bell's taco subscription is rolling out nationwide — here's how to get it (January 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[5] See UBS, Investing in digital subscriptions (March 10, 2021), https://www.ubs.com/global/en/wealth-management/our-

growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally. [6]

46.    As noted above, the production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years. According to Forbes, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[7]   Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[8] "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[9] Thus, "[t]he share prices of most subscription companies have performed well in recent years."[10]

---

approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%."). See also Subscribed, UBS Declares: It's Worth Investing in the Subscription Economy (April 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits? (October 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right- now-but-are-you-reaping-the-full-benefits-02434851.

[6] UBS, Investing in digital subscriptions (Mar. 10, 2021), supra ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); see also Juniper Research, Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally (Oct. 12, 2020),
https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake
(acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[7] The State Of The Subscription Economy, 2018, Forbes (Mar. 4, 2018),
https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[8] See UBS, Investing in digital subscriptions (Mar. 10, 2021), available at
https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[9] Id.

[10] Id.

47.     The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover. During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[11] According to The Washington Post, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[12]

48.     However, as The Washington Post has noted, there are downsides associated with the subscription-based business model. While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[13] In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[14] Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of

---

[11] UBS, Investing in digital subscriptions (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our- approach/marketnews/article.1525238.html.

[12] The Washington Post, Everything's becoming a subscription, and the pandemic is partly to blame (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[13] McKinsey & Company, Thinking inside the subscription box: New research on e-commerce consumers, (February 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking- inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[14] Id.

canceling their membership[s]."[15] As these companies have realized, "[t]he real money is in the inertia."[16] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[17] That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally confusing users with their app's design and flow, … and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs. [18]

49.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[19] Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[20] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts [and]

---

[15] Washington Post, Little-box retailing: Subscription services offer new possibilities to consumers, major outlets (April 7, 2014),
https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3- 8d62-419db477a0e6_story.html.
[16] Id.
[17] Business Insider, A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want (June 25, 2019),
https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.
[18]   TechCrunch, Sneaky   subscriptions   are   plaguing   the   App   Store   (October   15,   2018),
https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.
[19] The Washington Post, Everything's becoming a subscription, and the pandemic is partly to blame (June 1,     2021),     https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); see also New Media and Marketing, The problem with subscription marketing (Mar. 17, 2019),
https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.
[20] Id.

attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[21] widespread utilization of these misleading dark patterns and deliberate omissions persist.

50.     Defendant has successfully engaged these practices. According to Bloomberg, as of date, FloSports has more than 500,000 subscribers.[22] In 2021 alone, "FloSports saw its subscriber base grow by more than 50% year-over-year[] and saw 100% growth in traffic on its platform. Revenue grew by more than 50%."[23]

**B. Defendant's Online Complaints are Indicative of its Unlawful Subscription Practices**

51.     Consumers have complained on social media outlets both about Defendant's misleading enrollment process as well as its unclear cancellation process.

52.     Consumers complain about being charged a "one-time" fee for watching an event to then discover they had been charged for a year membership.

53.     Also, consumers complained about being misled into believing they were to incur a monthly charge only to be charged an annual membership which was exponentially higher than the advertised monthly fee.

54.     There over 900 complaints filed against on the Defendant ton he Better Business Bureau website, many of which involve these same issues.[24]  As of October 9, 2022, Defendant has 1.1/5 stars out of possible 5-stars with 1-star being the lowest rating and 5-star the highest in regarding to customer satisfaction.

---

[21] Id.
[22] Bloomberg, Niche Sports Streaming Service Expands While Giants Retrench (December 8, 2020), https://www.bloomberg.com/news/articles/2020-12-08/niche-sports-streaming-service-expands-while-giants-retrench#xj4y7vzkg.
[23] Austin Business Journal, FloSports' growth trajectory means new headquarters, more sports being streamed, tons of hiring (February 28, 2022),
https://www.bizjournals.com/austin/news/2022/02/28/flosports-new-hq-streaming-sports.html.
[24] https://www.bbb.org/us/tx/austin/profile/digital-media/flosports-inc-0825-1000108975

55.    Below is just a sampling of those reviews:



**JD B**
⭐☆☆☆☆

09/17/2022

I subscribed to FloBikes annually for $150 in Sept 2019 & 2020. In April 2021 I decided to cancel my subscription. (I didn't feel that it was worth anywhere near $150.). Cancel at any time is part of their ToS There was no refund. So, they "run out the clock" on your current sub. Which for me was Sep 16, 2021.When I checked the online status of my credit card on 9/18 and saw the annual charge from FloBikes I was disappointed but not surprised. This sloppiness is one of the reasons that I canceled the sub in the first place. Also, they sent no prior "heads-up" email reminding me of the payment they would automatically debit. I have not used the service since long before Sep 16, 2021. I won't use it in the future.I am not paying yet more money to FloBikes for their lousy streaming product and inability to run their business. I disputed the charge with my CC company who eventually determined that the charge was bogus.Guess what? Even though my card number changed this ******* FloBikes charges me for another year of subscription. How did they get my NEW CC number since I sure didn't give it to them? I learn from the *** that there is an "auto-update" service that businesses can subscribe to. Great I opt-out of that immediately.Now I wait to dispute yet another annual sub charge from FloBikes. A very scammy, dishonest, underhanded company. DO NOT DO BUSINESS WITH THEM. They never warn you ahead of time that they're gonna charge your CC (as most reputable businesses do) and they apparently are never held accountable.I'd give them 0 stars but BBB doesn't permit that. Why?



**FloSports Inc. Response**

10/03/2022

We are unable to locate this customer account via the name or email address.



**Keith P.**
⭐☆☆☆☆

09/17/2022

Terrible terrible terrible never on time with anything. So much wrong with this app its to much to put in text.

**Karen g**
⭐☆☆☆☆

09/12/2022

This is a terrible company. The website is very confusing. My child thought they were getting a sporting event for $12.50 when it was actually $150. I contacted support. They cancelled but not after charging me $30 for a 15 minute viewing accidentally. Hopefully, my credit card sees the credit. BAD *****************



**Treffen W**

⭐☆☆☆☆                                                          09/11/2022

Terrible company! Business model is designed to get parents of athletes to sign up for services and then charge ongoing annual fee. They never send notifications about your subscription or that you are about to be charged. Very difficult to even figure out how to cancel. Nothing works from mobile devices to contact them.



**Ms L**

⭐☆☆☆☆                                                          09/10/2022

Terrible quality, no customer service!! I agree with the reviews below. I only signed up to watch a soccer game - the feed for that game was not available. Tried to cancel the subscription immediately and customer service will only communicate through email and will not provide refund and will not answer questions. Do not sign up for this service!!

**Flo H**

⭐☆☆☆☆                                                          09/07/2022

This company has the most shady business practices I have ever dealt with. Only sign up for a Floracing subscription if you want to have them steal money from you. I signed up willingly for a years subscription. I only used it once and was promptly billed for another year automatically. I filed a dispute with the CC company...This gets there attention quickly, with several emails sent from their customer service team trying to get you to cancel the dispute. They stated they would refund all but 1-2 months of my subscription if I cancelled the CC dispute. I had not used the service a single time on the renewal and as a result of not agreeing to an auto renewal of a 1 year subscription I stated I'd let the dispute stand since I wanted a complete refund as I had not used the service a single time since it was renewed. Credit card company sided with them somehow and now they won't respond on refunding the the portion they said they were willing to do prior. Stay far away! Just look at the other reviews.




**Michael I**
⭐☆☆☆☆                                                    08/24/2022

Worst streaming service I've ever signed up for. Too expensive and they do not offer any
sort of refund even after canceling the subscription on the same day you signed up for it.
Charged $165.45. What a joke. Only reason I'm giving them 1 star is because you cannot
leave a 0 star rating.




**Bobby G**
⭐☆☆☆☆                                                    08/20/2022

When signing up for a monthly charge of **** per month... I got a charge of 154 for the year.
The wording clearly mentioned at the time we could do monthly or annual. When your sport
is not year round no body does an annual and these people know that. In stead of being
charged **** per month I was charged ****** for the year.Clearly these people have a bad
habit of doing this. I also was forced over here through ****** who canceled the ***** oil
motocross on MavTv plus and I paid monthly there also. Flosports is a scam in how they
market their product. And they are slow to show replays of the live events.

## C.  New York Automatic Renewal Law

56.     New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the
conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y.
GEN. BUS. LAW §349.

57.     On February 9, 2021, New York enacted strict laws regarding the provision of
automatic renewal and continuous service clauses in paid subscription or purchasing
agreements with consumers (N.Y. Gen. Bus. Law §§ 527 and 527-a).

58.      This law broadly governs any contract for goods or services with "any individual
who seeks or acquires, by purchase or lease, any goods, services, money, or credit for personal,
family, or household purposes" (N.Y. Gen. Bus. Law § 527(4)) in which a "plan or arrangement
in which a paid subscription or purchasing agreement is automatically renewed at the end of a
definite term for a subsequent term" (N.Y. Gen. Bus. Law § 527(1)) or in which a "plan or

arrangement in which a subscription or purchasing agreement continues until the consumer cancels the service" (N.Y. Gen. Bus. Law § 527(5)).

59.    The following five points provide an overview for complying with New York's recently enacted automatic renewal law:

- **Clear and Conspicuous**. Before the purchase of goods or services is made, the terms of the offer should "clearly and conspicuously" present that the subscription or purchasing agreement will continue until terminated, the cancellation policy, the amount of the recurring charges, the length of the automatic renewal term or that the service is continuous, and the minimum purchase obligation, if any. This may be accomplished by displaying the terms in larger type than the surrounding text, in contrasting type, font, or color to the surrounding text of the same size, and/or set off from the surrounding text of the same size by symbols or other marks that clearly calls attention to the language. For example, if made as an online purchase, the renewal terms should be in visual proximity to the acceptance button, however, not below it, and should not be contained in a link.
- **Affirmative Consent**. The consumer should affirmatively consent to the automatic renewal provision before the consumer is initially charged for the services and/or product purchased. It is generally accepted that a checkbox to agree next to the automatic renewal clause may suffice. However, the checkbox should not be "pre-checked" and if the consumer is also agreeing to other terms and conditions of the purchase, that consent should be separate from the automatic renewal consent.
- **Acknowledgment**. After the purchase, the consumer should receive a retainable notice that provides an acknowledgment of the automatic renewal terms, the applicable cancellation policy, and information on how the consumer can cancel the product and/or service. It is recommended that this acknowledgment be promptly sent by email after the order is received and/or contained in the first shipment of the product.
- **Cancellation**. The consumer should be provided with an "easy-to-use" mechanism to cancel the contract. This may include a toll-free number, email address, or postal address. If the consumer purchased the product or service online, then the consumer must also be able to cancel online.
- **Changes to Automatic Renewal Terms**. Before material changes to the auto-renewal policy or cancellation policy are made effective, the consumer must be notified of the changes in a "clear and conspicuous" manner, such as in an email or on the website where the consumer purchased the products and/or services, and the notice should be displayed prominently and set apart by bold text, colored text, all caps, or in a box. The notice should also contain information on how the consumer may cancel the subscription or purchasing agreement in a manner that is retainable by the consumer.

### D.  FloSports' Subscription Enrollment Process

60.     At all relevant times, Defendant offered, via the FloSports Website, the FS Subscriptions, which gives consumers access to its video streaming services.

61.     These paid subscriptions are offered on a recurring basis for monthly and/or yearly renewal terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels.

62.     For example, customers that sign up for a monthly FS Subscription are, at the end of the initial one-month period, automatically renewed and typically charged the full amount for the next month, and every month thereafter if they do not cancel.

63.     Similarly, customers enrolled in an annual FS Subscription are, at the end of the initial one-year period, automatically renewed and typically charged the full amount for the next year, and every year thereafter if they do not cancel.

64.     Defendant's FS Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of N.Y. Gen. Bus. Law § 527(1).

65.     To sign up for one of Defendant's FS Subscriptions, the consumer must first select a program.

66.     From the FloSports Website, prospective subscribers can review features of – and find links to the individual enrollment webpages for – each of Defendant's subscription offerings, including the FS Subscriptions at issue.

67.     Consumers can sign up for one of Defendant's subscription plans through the FloSports Website, on either its mobile or desktop format.

68.     Defendant automatically enrolls customers who purchase a paid FS Subscription via the FS Website in their chosen FS Subscription program going forward, by default.

69.     The enrollment process for each FS Subscription is substantially the same, regardless of the medium used.

70.     After selecting a subscription option, consumers are directed to subsequent webpages on the FloSports Website, where they are prompted to create a membership account and input their billing information.

71.     After these steps, consumers are directed to another, final webpage (the "Checkout Page"), where prospective subscribers are invited to complete their purchases.

72.     For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity to the request for consent to the offer[,]" which in this case pertains to the latter block of text located immediately above the final red "Start Watching" button that customers must press in order to complete the checkout process.

73.     By way of example, at least as of October 2022, when a consumer signed up for a FS Subscription via his or her computer web browser, the "relevant portion of the Checkout Page" refers to the disclosures in the block of text above the red "Start Watching" button (i.e., the "request for consent"), which contains the following language and appearance:

FIRST CHECKOUT PAGE:

# Payment

Step 3 of 3

**YEARLY**

## $12.50 /mo

$150.00 Paid Yearly

**Payment Info** 🔒                    VISA  ⬤⬤  AMERICAN EXPRESS  DISCOVER

Name on Card

💳 Card number                    MM / YY  CVC

Recurring billing, cancel anytime. By clicking Start Watching, you agree to our Payment Terms.

Start Watching

Having trouble paying? Contact Customer Support.

SECOND CHECKOUT PAGE:



74.     Regardless of how the consumer subscribes (via the FloSports Website on its mobile or desktop format), and irrespective of which particular FS Subscription plan the consumer selects, Defendant two check-out pages fails to disclose the full terms of its auto-renewal program

either before or after checkout, and it never requires the individual to read or affirmatively agree to any terms of service, i.e., by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for Defendant's FS Subscriptions.

75.    Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – its subscribers before charging consumers' Payment Methods on a recurring basis.

### E.  Defendant Violates New York's Automatic Renewal Law

76.    Pursuant to New York's Automatic Renewal Laws, Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of N.Y. Gen. Bus. Law §527-A(a); Defendant charged Plaintiffs' and the proposed class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of  N.Y. Gen. Bus. Law §527-A(b); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and/or information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of N.Y. Gen. Bus. Law §527-A(c).

### i.    Defendant Fails To Clearly And Conspicuously Present The FS Subscription Automatic Renewal Terms

77.    The relevant portion of Defendant's two different Checkout Pages do not clearly and conspicuously present the complete "automatic renewal offer terms" as defined by N.Y. Gen. Bus. Law §527-A(a).

78.     First, Defendant fails to clearly and conspicuously disclose that the subscription or purchasing agreement will continue until the consumer cancels as defined by N.Y. Gen. Bus. Law §527(3).

79.     As illustrated by the Fist Checkout Page above, although the relevant portion mentions that "Recurring billing, cancel anytime" this disclosure is grossly inadequate because it fails to specify that the consumer is even enrolling in an "annual subscription" in the first place in violation of N.Y. Gen. Bus. Law §527(3).

80.     The only extremely vague hint that this is an annual subscription is it mentions (YEARLY) which is inadequate to a put a consumer notice that this an annual subscription.

81.     Aside from being inconspicuous, the First Checkout Page fails to disclose that the subscription or purchasing agreement will continue until the consumer cancels" in the manner required by N.Y. Gen. Bus. Law §527(c).

82.     As illustrated by the Second Checkout Page above, although the relevant portion mentions that "Your annual subscription will automatically renew on [the year after the enrollment date] and each year thereafter until you cancel" this disclosure is also inadequate because it too fails to specify that the consumer is even enrolling in an "annual subscription" in violation of N.Y. Gen. Bus. Law §527(3).

83.     Specifically, the preceding text to that sentence, states "By clicking Start Watching, you will be charged $149.99 today for the first year."

84.     That call to action does not clearly state that consumers are agreeing to an "annual subscription," rather, it states that they are agreeing to a single charge to be placed that day.

85.    Thus, any reference to the recurring basis of the "annual subscription" is anomalous because it is not tied to what consumers are purportedly agreeing to—i.e., a single charge on the given day of purchase.

86.    Aside from being inconspicuous, Checkout Pages 1 and 2 fail to disclose that the subscription or purchasing agreement will continue until the consumer cancels in the manner as required by the statute. N.Y. Gen. Bus. Law §527(c).

87.     For the same reasons stated above, Defendant also fails to disclose the "length of the automatic renewal term or that the service is continuous" in violation of N.Y. Gen. Bus. Law §527(d).

88.    Defendant fails to disclose the "description of the cancellation policy that applies to the offer" in violation of N.Y. Gen. Bus. Law §527A(c).

   **ii. Defendant Fails To Obtain Consumers' Affirmative Consent To The Automatic Renewal Terms Associated With The FS Subscriptions**

89.    Defendant unlawfully charged Plaintiff's and the proposed class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal (and continuous service terms), including their promotional and discounted prices, in violation of N.Y. Gen. Bus. Law §527A(b).

90.    Specifically, Defendant does not at any point during the checkout process require consumers to read or affirmatively agree to any terms of service associated with their FS Subscriptions, e.g., by requiring consumers to select or click a "checkbox" next to the automatic renewal offer terms to complete the checkout process.

91.    In fact, as discussed above, the only terms that consumers could have purportedly agreed to, even without a checkbox manifesting affirmative consent, was in Checkout Box 1 "[b]y

clicking Start Watching, you will agree to our Payment Terms" and in Checkout Box 2 that "[b]y clicking Start Watching, you will be charged $150.99 today for the first year."

92.     That call to action, however, does not otherwise state that by clicking the call-to-action button consumers were also agreeing to an "annual subscription."

93.     Thus, at no point, during the enrollment process or on either Checkout Box 1 or 2, was there an unambiguous or affirmative consent to Defendant's automatic-renewal terms in violation of N.Y. Gen. Bus. Law §527A(b).

## V.     CLASS ALLEGATIONS

94.     As alleged throughout this Complaint, the Class' claims all derive directly from a single course of conduct by Defendant.  Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing tactics—and this case is about the responsibility of Defendant, at law and in equity, for its knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in the content of its statements or omissions. The objective facts on these subjects are the same for all Class members.

95.     Plaintiff sues on his own behalf and on behalf of a Class for damages and injunctive relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

96.     The Class, preliminarily defined as two subclasses ("Subclasses"), is as follows:

a.   The Multistate Class, preliminarily defined as all FloSports customers in the United States who were automatically enrolled into and charged for at least one month of FloSports membership by Defendant at any time from applicable statute of limitations period to the date of judgment.

b.   The New York State Class preliminarily defined as all FloSports customers in the state of New York (including customers of companies FloSports acts as a

successor to) who were automatically enrolled into and charged for at least one month of FloSports membership by Defendant at any time from applicable statute of limitations period to the date of judgment.

97.     Excluded from the class are the following individuals: officers and directors of Defendant and its parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

98.     Plaintiff reserves the right to modify or amend the definitions of the proposed class before the Court determines whether certification is appropriate.

99.     <u>Numerosity.</u> The members of the class are so numerous that a joinder of all members is impracticable.  While the exact number of class members is unknown to Plaintiff at this time, Plaintiff believes the class numbers in the tens of thousands, if not more.

100.    <u>Typicality.</u> Plaintiffs' claims are typical of the claims of the class members because, among other things, Plaintiff sustained similar injuries to that of class members as a result of Defendant's uniform wrongful conduct, and their legal claims all arise from the same events and wrongful conduct by Defendant.

101.    <u>Adequacy.</u>  Plaintiff will fairly and adequately protect the interests of the class members. Plaintiffs' interests do not conflict with the interests of the class members and Plaintiff have retained counsel experienced in complex class action cases to prosecute this case on behalf of the class.

102.    <u>Commonality.</u> Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual members of the class, including the following:

      a.     Whether Defendant's conduct constitutes unfair, unlawful and/or fraudulent practices prohibited by the laws of New York;

b.      Whether Defendant was unjustly enriched as a result of its conduct;

c.      Whether Class Members have been injured by Defendant's conduct;

d.      Whether any or all applicable limitations periods are tolled by Defendant's acts;

e.      Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

f.      The extent of class-wide injury and the measure of damages for those injuries.

103.    Ascertainability.  Class members can easily be identified by an examination and analysis of the business records maintained by Defendant, among other records within Defendant's possession, custody, or control.

104.    Predominance. The common issues of law and fact identified above predominate over any other questions affecting only individual members of the class.  The class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's conduct.

105.    Superiority. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since a joinder of all members is impracticable. Furthermore, as damages suffered by class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to individually redress the wrongs done to them. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

106.    Accordingly, this class action is properly brought and should be maintained as a class action because questions of law or fact common to class members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

107.    This class action is also properly brought and should be maintained as a class action because Plaintiff seeks injunctive relief and declaratory relief on behalf of the class members on grounds generally applicable to the proposed class.

108.    Further, the following issues are also appropriately resolved on a class-wide basis under Fed. R. Civ. P. 23(c)(4):

a.    Whether Defendant's conduct constitutes unfair, unlawful and/or fraudulent practices prohibited by the laws of New York;

b.    Whether Defendant was unjustly enriched as a result of its conduct;

c.    Whether Class Members have been injured by Defendant's conduct;

d.    Whether any or all applicable limitations periods are tolled by Defendant's acts;

e.    Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

f.    The extent of class-wide injury and the measure of damages for those injuries.

109.    Certification is appropriate because Defendant has acted or refused to act in a manner that applies generally to the proposed class, making final declaratory or injunctive relief appropriate.

**FIRST CAUSE OF ACTION**
**Violation of the Electronic Funds Transfer Act**
**15 U.S.C. 1693, et seq.**
**(On behalf of Plaintiff and Nationwide EFTA Subclass)**

110.    Plaintiff incorporates the previous allegations as though fully set forth herein.

111.    Plaintiff seeks to recover for FloSports's violations of the Electronic Funds Transfer Act on behalf of herself and the Nationwide EFTA Subclass.

112.    The EFTA provides a basic framework establishing the rights, liabilities, and responsibilities of participants in an electronic fund transfer system. 15 U.S.C. §§ 1693 et seq. The "primary objective" of the EFTA "is the provision of individual consumer rights." Id. § 1693(b).

113.    Any waiver of EFTA rights is void. "No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter." 15 U.S.C. § 1693l.

114.    FloSports's transfers of money from the bank accounts of Plaintiff and members of the Nationwide EFTA Subclass, via their debit cards, as alleged herein, are "electronic fund transfers" within the meaning of the EFTA and the EFTA's implementing regulations, known as Regulation E and codified at 12 C.F.R. §§ 205 et seq. An "electronic fund transfer" means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). The term is expressly defined to include "[t]ransfers resulting from debit card transactions, whether or not initiated through an electronic terminal." 12 C.F.R. § 205.3(b)(v).

115.    The EFTA defines the term "preauthorized electronic transfer" as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9). The Official Staff Interpretation of Regulation E describes a "preauthorized electronic transfer" as "one authorized by the consumer in advance of a transfer that will take place on a

recurring basis, at substantially regular intervals, and will require no further action by the consumer to initiate the transfer." 12 C.F.R. Part 205, Supp. I, § 205.2(k), cmt. 1.

116.    Section 1693e(a) of the EFTA prohibits preauthorized electronic transfers without written authorization: "A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). Similarly, Regulation E provides: "Preauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer." 12 C.F.R. § 205.10(b).

117.    Plaintiff and members of the Nationwide EFTA Subclass each maintained an "account" as that term is defined in 15 U.S.C § 1693a(2) and are "consumers" within the meaning of 15 U.S.C. § 1693a(5).

118.    FloSports uniformly and routinely initiated preauthorized electronic fund transfers and took money from the bank accounts of the Plaintiff and members of the Nationwide EFTA Subclass without obtaining their written authorization for the transfers, as required by the EFTA and Regulation E.  FloSports also uniformly and routinely failed to provide a copy of any such written authorization to Plaintiff and the Nationwide EFTA Subclass members from whose bank accounts FloSports took preauthorized electronic fund transfers for monthly membership fees.

119.    FloSports took funds from bank accounts managed by Plaintiff via debit card. In none of these instances did FloSports obtain Plaintiff's written authorization, nor did FloSports provide Plaintiff with copies of any such written authorizations.

120.    The Official Staff Interpretation of Regulation E explains, "when a third-party payee," such as FloSports, "fails to obtain the authorization in writing or fails to give a copy to the consumer … it is the third-party payee that is in violation of the regulation." 12 C.F.R. Part 205, Supp. I, § 205.10(b), cmt. 2.

121.     As a direct and proximate result of FloSports's violations of the EFTA and Regulation E, Plaintiff and class members have suffered damages in the amount of the unauthorized debits taken by FloSports. 15 U.S.C. § 1693m. As a further direct and proximate result of FloSports's violations of the EFTA and Regulation E, Plaintiff and the Nationwide EFTA Subclass members are entitled to recover statutory damages in the amount of "the lesser of $500,000 or 1 per centum of the net worth of the defendant." Id. § 1983m(a)(2)(B).

122.     Pursuant to 15 U.S.C. § 1693m, Plaintiff and the Nationwide EFTA Subclass are also entitled to recover costs of suit and attorneys' fees from FloSports.

## SECOND CAUSE OF ACTION
### Violations of New York General Business Law § 349
### (On Behalf of Plaintiff and the New York Class Members)

123.     Plaintiff incorporates the previous allegations as though fully set forth herein.

124.     Plaintiff brings this claim under N.Y. GEN. BUS. LAW § 349 on their own behalf and on behalf of each member of the Class.

125.     New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW §349.

126.     Defendant's marketing and billing practices are consumer-oriented in that they are directed at members of the consuming public.

127.     By engineering and implementing fraudulent billing and advertising practices, Defendant engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW §349.

128.   Defendant has violated N.Y. GEN. BUS. LAW §349 statute by, inter alia:

    a.    Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

    b.    Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

    c.    Omitting material information in order to prevent customers from cancelling their trial before the last day of the trial period;

    d.    Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan; and

    e.    Curtailing customers' ability to easily cancel their subscription to FloSports prior to the expiry of the trial period.

129.   The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action.

130.   Plaintiff and the members of the New York Class further seek equitable relief against Defendant.  Pursuant to N.Y. GEN. BUS. LAW §349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order

directing Defendant to refund to the Plaintiff and the Class all monthly fees wrongfully assessed and/or collected on its auto-renew subscription plan.

### THIRD CAUSE OF ACTION
#### Conversion
#### (On Behalf of Plaintiff and the Nationwide Class)

131.    Plaintiff incorporates the previous allegations as though fully set forth herein.

132.    Defendants have enrolled consumers, including Plaintiff and members of the Classes, in automatic renewal programs and/or continuous service programs and have (a) failed to present the automatic renewal or continuous service offer in a clear and conspicuous manned before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer, in violation of § 17602(a)(1); (b) charging the consumer's credit or debit card or the consumer's third-party payment account for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to an agreement containing clear and conspicuous disclosures of the automatic renewal offer terms or continue service offer terms, in violation of § 17602(a)(2); and (c) failed to provide an acknowledgment that includes the required clear and conspicuous disclosure of automatic renewal or continuous service offer terms, cancellation policy, information regarding how to cancel, and a toll-free telephone number, electronic mail address, postal address or other mechanism for cancellation, in violation of § 17602(a)(3) and § 17602(b).

133.    Plaintiff and members of the Classes have suffered injury in fact and lost money as a result of Defendant's unlawful failure to obtain authorization to transfer auto renewal funds for its monthly memberships.

134.    Defendants' collection and retention of money resulted in the wrongful exercise of dominion over property belonging to Plaintiff and members of the Classes and Plaintiff and

members of the Classes are entitled to restitution of all amounts that Defendants charged to Plaintiff's and members of the Classes' credit cards, debit card, or thirty-party payment accounts.

## FOURTH CAUSE OF ACTION
### Negligent Misrepresentation
### (On Behalf of Plaintiff and the Class)

135.   Plaintiff incorporates the previous allegations as though fully set forth herein.

136.   Defendant's practice of failing to adequately advise consumers that they would enter into automatic renewals, failure to provide the acknowledgement required by the Automatic Renewal Laws, and/or failure to provide an easy way to cancel as advertised are material facts that influenced Plaintiff and the class members' subscription to the service.

137.   At the time Defendant made the misrepresentations, Defendant knew or should have known that the misrepresentations were false, or Defendant made the misrepresentations without knowledge of their truth or veracity.

138.   Plaintiff and the class members reasonably, justifiably, and detrimentally relied on the misrepresentations and, as a proximate result thereof, have and will continue to suffer damages.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

139.   Plaintiff incorporates the previous allegations as though fully set forth herein. allegation contained elsewhere in this Complaint as if fully set forth herein.

140.   By failing to adequately advise consumers that they would enter into automatic renewals, failure to provide the acknowledgement required by the Automatic Renewal Law, and failure to provide an easy way to cancel as advertised, Defendant was unjustly enriched at the expense of Plaintiff and class members. It would be inequitable, unjust, and unconscionable for Defendant to retain the profit it received by unauthorized subscription payments.

141.    Plaintiff seeks disgorgement of all proceeds, profits, benefits, and other compensation obtained by Defendant from their improper and unlawful subscription charges, as well as all other appropriate relief permitted by law of unjust enrichment, including reasonable attorneys' fees and costs of suit.

### **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiff as Class representative, and designating Milberg LLP as Class Counsel;

(b)    Find that Defendant has committed the violations of law alleged herein;

(c)    Determine that Defendant has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Nationwide Class or, alternatively, the New York State Class;

(e)    Enter an order granting all appropriate relief including injunctive relief on behalf of the State Classes under the applicable state laws;

(f)    Render an award of compensatory damages, the exact amount of which is to be determined at trial;

(g)    Render an award of punitive damages;

(h)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(i)    Grant all such other relief as the Court deems appropriate.

Dated:  November 8, 2022

Respectfully submitted,

*/s/ Randi Kassan*

Randi Kassan
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza
Garden City, NY  11530
Telephone: (212) 594-5300
rkassan@milberg.com

Scott Harris*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC  27603
Telephone:  (919) 600-5003
sharris@milberg.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: 866.252.0878
gklinger@milberg.com

*\* Pro Hac Vice forthcoming*